# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 07-CV-4811 (JFB) (ETB)
_____

CHRISTOPHER BROWN,

Plaintiff,

VERSUS

COUNTY OF NASSAU,

Defendant.

_____

**MEMORANDUM AND ORDER**
September 3, 2010
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Christopher E. Brown ("plaintiff" or "Brown") brings this action against defendant Nassau County ("defendant" or "the County") alleging violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*. ("ADA"), as well as the Rehabilitation Act, 29 U.S.C. § 794 *et seq*. ("Rehabilitation Act").[1] In particular, plaintiff alleges that he is a disabled individual in a wheelchair who attends New York Islander games at the Nassau Coliseum ("the Coliseum") and that the Coliseum is not readily accessible to the disabled because of

problems related to, among other things, seating areas, parking, routes and ramps, restrooms, concession and ticket counters, and elevators. Plaintiff seeks, *inter alia*, permanent injunctive relief, monetary damages, as well as attorneys' fees and costs. The County denies these allegations.

Brown and the County have cross moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court denies the cross-motions for summary judgment because disputed issues of material fact exist with respect to plaintiff's claims arising under the ADA and Rehabilitation Act that cannot be resolved on summary judgment. In particular, plaintiff has submitted sufficient evidence—including (1) a sworn statement in which he details his problems obtaining

---

[1] Defendants New York Islanders Hockey Club, L.P. and SMG Facility Management Corp. have been dismissed from the case by stipulation.

seating at games and his inability to use restrooms and other basic services at games due to structural barriers, (2) an expert report outlining the existence of these barriers and estimating the costs of necessary modifications to be approximately $190,000, and (3) a 1994 proposal solicited by the County that recommended making a number of structural modifications to make the Coliseum more accessible to the disabled (these modifications were never made)—to raise genuine issues of fact as to whether the Coliseum is readily accessible and usable by individuals with disabilities. Although the County argues, among other things, that the fact that plaintiff has been able to attend some games in the past in his wheelchair precludes as a matter of law any argument by plaintiff that he lacks program access to the Coliseum in violation of Title II, the Court disagrees. If plaintiff can demonstrate that he has been unable to obtain seating because the 44 seats that are reserved for the disabled at the 16,000 seat Coliseum are insufficient to make it *readily* accessible to the disabled and/or plaintiff can demonstrate that he cannot use basic services at the arena (such as restrooms and parking) while attending games because of architectural/structural barriers, he may be able to meet his burden of proving that he is being deprived of program access under the standard for pre-1992 "existing facilities" under Title II and the Rehabilitation Act, even if the evidence also shows that he has been able to attend some hockey games with great difficulty. Although plaintiff cross-moves for summary judgment based on the County's failure to submit an expert report contradicting his expert report, the Court concludes that the absence of an expert report from the County does not prevent it from attempting to undermine the methodology and/or conclusions of the plaintiff's expert, as well as

plaintiff's other evidence at trial. In short, the Court concludes, given the record in this case, that there are fact-specific inquiries in dispute that must be resolved by the factfinder at trial, and, thus, the cross-motions for summary judgment are denied.

## I. Background

### A. Facts

The facts described below are taken from the parties' depositions, affidavits, and exhibits, as well from as the parties' Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of N.Y.*, 422 F.3d 47, 50 n.1 (2d Cir. 2001). Unless otherwise noted, where a party's Rule 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

### 1. The Parties

Plaintiff suffers from arthrogryposis and is disabled. (Pl.'s 56.1 ¶ 1.) As a result of this disability, his mobility is impaired and he requires a wheelchair to ambulate. (*Id*.) In late 2002, plaintiff began attending hockey games at the Coliseum and has returned three to six times per year since 2002. (*Id*. ¶ 2.)

Nassau County owns the Coliseum building and facilities. (*Id*. ¶ 4.) The County is a public entity subject to Title II of the ADA. (*Id*. ¶ 5.) Nassau County is also subject to the Rehabilitation Act because it receives funding from the federal government. (*Id*. ¶ 6.)

2

### 2. The Nassau Coliseum

As noted above, Nassau County owns the Coliseum. The County entered into a lease, dated October 15, 1979, with Hyatt Management Corporation of New York, Inc. (which later changed its name to Facility Management of New York, Inc.) for use and operation of the Coliseum for an original term of ten years commencing January 1, 1980, which could thereafter be extended for four additional five-year terms. (Def.'s Ex. 7 at 7, ECF No. 57-7.) The County subsequently agreed to a fifth option that, if exercised, would extend the lease term through July 15, 2015. (Def.'s Ex. 8 at 21, ECF No. 57-8.) By separate agreement, dated January 24, 1991, Spectator Management Group ("SMG") was assigned the lease with the County. (*Id.* at 28-36.) Under the lease, the obligation to make all additions and modifications to the Coliseum, and to perform such work as is mandated by the law, remains with the County. (Def.'s Ex. 7 at 29.) However, each year, the tenant is to provide the County Budget Director with a schedule of any such repairs or modifications that are reasonably anticipated. (*Id.*)

### 3. The 1994 Request for Proposals

In 1994, the Nassau County Department of Public Works ("NCDPW") issued a Request for Proposal ("RFP") for "Architectural/Engineering Services, ADA Compliance, Nassau Veterans Memorial Coliseum, Project 90980." (*See* Pl.'s Ex. J, at 2, ECF No. 68-3.). In response to that RFP, the firm of Greenman Pedersen, Inc.—which consists of consulting engineers, architects and planners, as well as construction engineers and inspectors—submitted a proposal. In a cover letter to the proposal, dated April 12, 1994, GPI's Chief Engineer stated,

> We have reviewed the project scope, made a site visit on Monday, April 4, and feel that we have a thorough understanding of the project requirements. We understand that the Nassau Veterans Memorial Coliseum requires handicapped modifications and barrier removals in order to facilitate the needs of its physically challenged patrons.

(Pl.'s Ex. E at 7, ECF No. 64-3.) The proposal then recommended a number of architectural/structural modifications to facilitate access to basic services at the Coliseum. These modifications were based upon a walkthrough of the Coliseum with Mr. Lance W. Elder, the facility's Assistant General Manager. (*Id.* at 24.) Some of the structures the proposal recommended be modified included the following: (1) toilets in the public restrooms; (2) concession-stand counters; (3) entrance doors; (4) exit doors; (5) executive viewing boxes; (6) elevators; (7) fire alarm pull boxes; (8) pedestrian ramps; (9) parking lots; and (10) seating. (*Id.* at 1-6, 9.) Reproduced below are some examples of specific recommendations made by the proposal.

- "G E N E R A L  T O I L E T RENOVATIONS – ARENA LEVEL – Mr. Elder accompanied us to a common-arena level toilet, which is atypical [sic] of the 8 mens and 8 womens toilet clusters. The Survey was reviewed, and the miscellaneous retrofitting contents were deemed logical and necessary. Entry doors will require modifications as

necessary to allow accessibility. Separate tilt mirrors, true handicapped accessible lavatories, and modifications to existing 'handicapped toilet units' held correct. The most viable solution is to provide 5'-0" x 5'-0" accessible units would be to move shared end walls over approximately 12" from their current positions, taking the space from the adjacent storage closets. Toilet flush controls need retrofitting to the wide side of each accessible toilet, and isolated men's room urinals will require lowering. Toilet seat heights will require raising, and all bathroom doors require handicapped access signs. (This is a *Basic Services* item – see Cost Proposal.)" (*Id*. at 24.)

- "CONCESSION STAND COUNTER AND TICKET BOOTH WINDOWS–All existing concession stand counters, at both exhibition hall and arena levels, will require lowering of approximately 6' to provide 36" A.F.F. to comply. The survey states that all concession counters require lowering; however, it would appear that providing approximately 50% of the units with lower counters would suffice, locating these stations closer to the arena handicapped seating gates. There are several 'cafeteria-style' concession areas which will not be a part of this capital project; Mr. Elder stated that these areas serve identical refreshments to the

public, so the counter-style concession conversions along would [sic] appear to be adequate. Mr. Elder then directed us towards the existing ticket sales counters at the main Concourse Level. The existing 15 sales stalls are serviced by a 42" high counter. At least one of these ticket stalls must be modified to accommodate a 36:" counter height. There are also three advance ticket sales stalls accessible from the Concourse corridor, once one enters into the Arena. One of these counters must be lowered to 36" A.F.F. (This is a *Basic Services* item – see Cost Proposal.)" (*Id*. at 24-25.)

- "EXISTING ENTRANCE DOORS–Mr. Elder questioned the necessity to widen the existing entry doors, as they are all manned by ushers on event occasions. This method of providing personal services would be an acceptable 'Alternative Method' of ADA Title III – Existing Facilities, but only if doors are manned at *all* hours of operation, which is not the case. **The issue of door widths shall be dictated by the intent and direction of the ADA guidelines, once design is underway**. Should widening be required and accepted, the doors and frames are storefront-style aluminum, and set up in individual pairs, grouped in sections of four. Retrofitting of one cluster of doors would appear to be sufficient enough to conform to ADA requirements. This would require

removal of existing storefront and replacement with a similar, but wider, system. (This is a Basic Services item – see Cost Proposal)." (*Id*. at 25.) (emphasis in original)

- "EXISTING EXIT DOORS– Here also, the retrofitting of one bank of accessible doors per exit cluster (all around the arena level) will be required as a part of the basic scope. Again, this will require removal of existing storefront and replacement with a similar, wider, system. (This is a *Basic Services* item – see Cost Proposal.)" (*Id*. at 25.)

- "ELEVATOR NEAR PEDESTRIAN RAMP TO ARENA LEVEL–Mr. Elder directed us to the elevator near the arena pedestrian ramp. All items within the 1992 Survey appeared necessary: There are no audible signals to indicate car position on/between floors; the elevator isn't equipped with Braille characters for control buttons; and floor buttons on the control panel are mounted higher than 54" maximum reach height for side approach. (This is a *Basic Services* item – see Cost Proposal.) Note that this elevator is used as a combination passenger freight unit for the public and employees, and as such complies with Section 4.10.1 of the 1991 Federal Register. The elevator is, however, located upon an alternate accessible route, as described in #9

below. The issue of providing an additional elevator on a direct accessible route is further discussed under 'ACCESS TO EXHIBITION HALL— PEDESTRIAN RAMP AT AREA FLOOR LEVEL' later in this Section." (*Id*. at 25-26.)

- "MAIN PARKING LOT–The existing total amount of parking spaces is, according to Mr. Elder, 7,000. In accordance with 4.1.2(5)(a) of the Federal Register, the required minimum number of accessible parking spaces shall equal '20 for 1,001 spaces, plus 1 for each 100 over 1,000'. This would equal 80 accessible spaces, and can be located along *at least one* accessible route. The existing number of accessible spaces, along with their layout, will be reviewed under our **Basic Services**. Further review of 4.1.2(5)(b) states that 'one in every eight accessible spaces will require a 96' wide access and be designed 'van accessible.' This will also be reviewed under our **Basic Services**. In addition, stall lengths must be reviewed and determined for accessibility and all accessible parking will require signage per 4.64 of the Federal Register. (All the above are *Basic Services* items – see Cost Proposal.)" (*Id*. at 27.)

- "ACCESSIBLE ARENA SEATING AREAS–Mr. Elder escorted our representatives to Sections 202 and 222, to show the existing available handicapped

seating areas. The aisle areas designated for handicapped seating are specifically for wheelchair-bound spectators. A common problem with the Section 222 seating area is that it is totally obstructed in terms of view . . . for all concert and stage-based productions. Mr. Elder stated that [the] view is fine during hockey and lacrosse games. While these two Sections are manned with Patrons in times of usage, the exact square footage of existing dedicated floor area must be determined, compared to the ADA guidelines, and be expanded accordingly. One major drawback will be the possible elimination of recently installed semi-permanent raised seating, which is no doubt fully used during the course of hockey and lacrosse games. This will present a conflict with the Facility, in terms of lost 'permanent' seats and we would look to the Owner to enforce the mandated floor areas necessary to supply handicapped seating. Based upon Schematic Phase layouts of the existing facility, we will incorporate level dedicated floor area throughout the arena. Based on 4.1.3(19) – 'Assembly Area Seating' of the Federal Register, the arena area, based on its maximum capacity of 16,000 patrons will require 170 wheelchair locations of approximately 11 square feet each. (This is a *Basic Services* item – see Cost Proposal.)" (*Id.* at 27.)

The total proposed fee for these modifications was $99,929.92. (*Id.* at 1, 9.) The proposal also referred to a prior survey called the "ADA Compliance Report Survey of July, 1992" which was "independently compiled for NCDPW by the Eastern Paralyzed Veteran's Association." (*Id.* at 9.) In addition to the GPI proposal, the County also received a proposal from an architect/engineer which indicated that it would be feasible to make the Coliseum more accessible to the disabled. (Ex. J at 2, ECF No. 68-3 ("A review of the Coliseum shows it to be suitable for excellent integration of Barrier Free requirements in a way that will make the total concept even more useful for the public at large, the impaired and the senior population whether as spectator, participant, employee or the press.").)

It is undisputed that, upon receiving these responses, the County never made any modifications to the Coliseum with respect to these issues. (Pl.'s 56.1 ¶ 7.)

### 4. Plaintiff's Affidavit

In his affidavit, plaintiff states he is disabled and suffers from Arthrogryposis, which causes him to be confined to a wheelchair, and also causes dexterity issues in his arms and hands. (Pl.'s Aff. ¶ 5, ECF No. 63-1.) Plaintiff further explains that he "first visited Nassau Coliseum in 2002 to watch the New York Islanders play the New York Rangers and other teams" and has "been back to the Coliseum between 3-6 times a year since then to watch the hockey games." (*Id.* ¶ 6.) Plaintiff asserts that he has had difficulty purchasing wheelchair accessible seats because there are too few of such seats available. Specifically, he states that he has "not been able to purchase a wheelchair

accessible seat since 2002-2003 season due to lack of availability" and, as a result, he is "generally forced to purchase a standard seat and attempt to get an accessible seat while at the game or park [his] wheelchair in a seating aisle." (*Id*. ¶ 10.)[2] Plaintiff also states that, as a result of the lack of structural and other accommodations for his disability, he has difficulty with respect to numerous aspects of his visits to the Coliseum, including the following: parking; physically accessing the building; using the restrooms and elevators; and purchasing food and souvenirs. In particular, he describes the following:

(1) Parking – "During my visits, I've had problems with the parking due to trouble locating available handicap accessible parking. Due to my issues, I generally use public transportation to get to the [C]oliseum." (*Id*. ¶ 7.)

(2) Physical Access to the Arena – "During my visits, I've had trouble getting from the parking and drop off area into the Coliseum due to lack of proper ramps, broken up pavement, high lips at curb cuts, and high thresholds on the entrance doors." (*Id*. ¶ 8.)

(3) Restrooms – "During my visits, I was not able to use the restrooms located outside of the Coliseum due to a step up without a ramp. Due to lack of accessible outdoor restrooms, I do not attend tailgates before games . . . . During my visits, I had a lot of difficulty using the restrooms as the entrances to them are too narrow for my wheelchair to fit through, the doors to the toilet stalls are also too narrow, there aren't any proper grab bars for a safe transfer onto the toilets, there is exposed piping below the sinks, and I can't reach many of the amenities such as soap dispensers and paper towel dispensers. Due to these restroom issues, I try to avoid food and drinks at games so that I will not have to go to the restrooms during the game." (*Id*. ¶¶ 9, 11.)

(4) Ticket/Service Windows and Concession Vendors – "During my visits, I had difficulty at the ticket/service windows and concession vendors for food, drink and souvenirs because the counters are all too high, I can't see over them and it makes it very difficult to pay for and take away my items. Due to this issue and the restrooms barriers, I try to avoid food and drinks during games." (*Id*. ¶ 12.)

(5) Elevators – "During my visits, I had difficulty using the elevators because they aren't very wide inside which makes it difficult to maneuver with my wheelchair." (*Id*. ¶ 13.)

After describing these problems in his affidavit, plaintiff concludes his affidavit by stating that "[o]verall, the barriers at the

---

[2]    Plaintiff also described one particular "humiliating standoff" with a Coliseum employee in 2005 involving seating: "In 2005, I purchased general admission tickets for myself and a friend, but when I tried to enter, I was stopped by an employee who told me that I had to pay extra for wheelchair accessible seating and pay extra for my friend to sit with me in that section because the only accessible seats were located on a different (more expensive) level than the ticket I purchased. Only after a humiliating standoff did the employee allow my friend and I inside to watch the game." (*Id*. ¶ 14.)

Coliseum caused me difficulty, frustration and humiliation, and caused me great difficulty or altogether prevented me from participating in all of the services offered at the Coliseum, such as purchasing a ticket in a section of my choice, purchasing food and drink, using the restrooms, using the ticket counters, access to the parking lot, and generally getting in and around safely." (*Id*. ¶ 15.) Finally, plaintiff notes that he "[i]ntends to return to the Coliseum to watch future Islanders games, particularly when the Rangers play the Islanders." (*Id*. ¶ 16.)

### 5. Plaintiff's ADA Expert

Plaintiff has submitted the report of an ADA expert, J.P. Cunningham Jr., P.E. The report summarizes the expert's observations and findings, following a site inspection of the Coliseum. The report purported to examine whether the Coliseum was in compliance with Title II and Title III of the ADA, and the relevant implementing regulations, including the "ADA Accessibility Guidelines for Buildings and Facilities – July 1, 1994 ("the ADAAG"), which are part of the implementing regulations for Title III of the ADA. (Exs. B1 and B2., ECF Nos. 63-2 and 63-3.) Mr. Cunningham concludes that there were a total of 151 items at the Coliseum that deviated from the ADAAG. The report includes photographs and measurements of various barriers to access identified by Mr. Cunningham, along with proposed modifications to remove the barriers, as well as the estimated costs for the modifications. The estimated total costs for the modifications proposed by Mr. Cunningham is $190,650. Many of the access problems identified by Mr. Cunningham in various areas of the property and building—including seating, parking, routes and ramps, restrooms, concessions and

ticket counters, and elevators—were consistent with the findings of the 1994 proposal solicited by the County.

Plaintiff also submitted the expert report of a financial analyst, Natik Ganiyev, which analyzes the financial feasability of the proposed ADA compliance modifications. (Ex. D.) Specifically, the report analyzed the County's financial ability to remove the barriers identified by Mr. Cunningham based upon a review of the profit and loss schedule of the Coliseum for the past five years and the overall resources available to the County. Based upon that analysis, the report concluded that the cost of the proposed modifications—namely, $190,650—would not result in an undue financial burden on the County.

The County did not produce any expert reports to rebut plaintiff's experts.

### B. Procedural History

Plaintiff filed this action on November 19, 2007 against Nassau County and SMG Facility Management Corporation ("SMG"). Nassau County answered the complaint on February 1, 2008. SMG answered the complaint on March 21, 2008. On October 20, 2008, pursuant to a stipulation, the case against SMG was dismissed with prejudice. On February 19, 2009, an amended complaint was filed adding the New York Islanders Hockey Club, LP (the "New York Islanders") as a defendant. The New York Islanders answered the amended complaint on June 1, 2009. On November 23, 2009, pursuant to a stipulation, the case against the New York Islanders was dismissed. On February 26, 2010, Nassau County filed its motion for summary judgment. On March 31, 2010,

plaintiff filed his opposition to the County's motion and filed a cross-motion for summary judgment. On May 13, 2010, Nassau County filed its opposition to plaintiff's motion and reply on the County's motion. On May 28, 2010, plaintiff filed a reply on his cross-motion for summary judgment. Oral argument was held on July 29, 2010. The Court has fully considered the submissions of the parties.

## II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he

nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (emphasis in original)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

III. Discussion

A. Applicable Law[3]

The ADA was enacted by Congress to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[.]" 42 U.S.C. § 12101(b)(1). Title I of the ADA prohibits employment discrimination. *See id.* § 12112. Title III prohibits discrimination by private entities in public accommodations, such a hotels, theaters, and train stations. *See id.* §§ 12181-82.

The section of the ADA at issue in this case, Title II, prohibits disability discrimination by public entities in connection with access to public services. Specifically, Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The prohibition of disability discrimination in Title II with respect to access to services, programs, or activities "encompasses virtually everything that a public entity does." *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998). The definition of "public entity" includes "any state or local government" and "any

department, agency, special purpose district, or other instrumentality of a State or States or local government[.]" 42 U.S.C. §§ 12131(1)(A), (B). Persons with disabilities are "qualified" individuals if they, "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meet[] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

In order for plaintiff to prove a violation of Title II, the plaintiff must establish the following: (1) that plaintiff is a "'qualified individual' with a disability"; (2) that the defendant is subject to Title II; and (3) that plaintiff was "'denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or [was] otherwise discriminated against by defendants, by reason of [her] disabilit[y].'" *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)). In the instant case, the County of Nassau does not dispute that it is a covered "public entity" under Title II, nor does it dispute that plaintiff is a "qualified individual" with a disability. Thus, the only issue is whether plaintiff has suffered discrimination on the basis of his disability under Title II by being denied access to activities at the Nassau Coliseum.

The ADA gives the Attorney General the authority to promulgate regulations that implement Title II. *See* 42 U.S.C. § 12134(a). The implementing regulations provide different standards for facilities depending upon whether the facility was built before or

---

[3] Plaintiff brings claims under Title II of the ADA and Section 504 of the Rehabilitation Act. It is well settled that "[c]laims under Title II of the ADA and section 504 of the Rehabilitation Act are treated identically." *Tylicki v. St. Onge*, 297 F. App'x 65, 66 (2d Cir. 2008) (citing *Henrietta D. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)). Thus, the Court will not separately analyze the Section 504 claim but rather will utilize the ADA framework to analyze both claims.

after Title II's effective date, January 26, 1992.

A higher standard applies to facilities constructed after that date. These facilities must be designed and constructed to be "readily accessible" to individuals with disabilities. Additionally, when a facility is altered after January 26, 1992, the altered portion of the facility must be "readily accessible" "to the maximum extent feasible." 28 C.F.R. § 35.151(b). Whether a facility is accessible is determined by whether the facility complies with either the Uniform Federal Accessibility Standards (UFAS) or the ADAAG. As noted above, the ADAAG is appended to the implementing regulations for Title III of the ADA and is incorporated by reference into Title II's implementing regulations. *See id.* § 35.151(c).

However, a public entity is not "[n]ecessarily require[d]" to make a facility built before January 26, 1992, such as the Nassau Coliseum, accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a)(1). Nor is a public entity required to make "fundamental alteration[s]" to existing facilities or take action that is unduly burdensome. *Id.* § 35.150(a)(3). Instead, with respect to existing facilities, "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." *Id.* § 35.150(a)(1). The regulations define "facility" as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." *Id.* § 35.104. Accordingly, if the stadium or arena is an existing facility, a public entity is not required to make each and every portion of a stadium or arena readily accessible in order to comply with the ADA; instead, the applicable test under the implementing regulations is whether the stadium or arena is, when viewed in its entirety, readily accessible and usable by individuals with disabilities. *See, e.g.*, *Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d 221, 223-24 (S.D.N.Y. 1999). This test is referred to as the "program access" requirement and, as explained in the preamble to the regulations of Title II, "although title II may not require removal of barriers in some cases where removal would be required under title III, the program access requirement of title II should enable individuals with disabilities to participate in and benefit from the services, programs, or activities of public entities in all but the most unusual cases." Preamble to Regulations on Nondiscrimination on the Basis of Disability in State & Local Government Services, 28 C.F.R. Pt. 35, App. A. Thus, "Title II's emphasis on 'program accessibility' rather than 'facilities accessibility' was intended to ensure broad access to public services, while, at the same time, providing public entities with the flexibility to choose how best to make access available." *Parker v. Universidad de P.R.*, 225 F.3d 1, 6 (1st Cir. 2000). Moreover, as noted above, the applicable regulations do not require a public entity to take any action that would result in a fundamental alteration in the nature of services or an undue burden. *See* 28 C.F.R. § 35.150(a)(3); *see also Toledo v. Sanchez*, 454 F.3d 24, 32 (1st Cir. 2006) ("Title II imposes an affirmative obligation on public entities to make their programs accessible to qualified individuals with disabilities, except where compliance would result in a fundamental alteration of services or impose an undue burden.").

With respect to this statutory scheme, courts have applied a burden-shifting framework in which the plaintiff has the initial burden of proving that (1) one or more barriers exist that demonstrate that the facility, when viewed in its entirety, is not readily accessible and usable by individuals with disabilities—that is, a lack of program accessibility, and (2) there are plausible modifications that could be made to make the facility readily accessible and that the costs of such modifications, facially, do not clearly exceed their benefits. Once plaintiff makes that showing, the burden of persuasion shifts to the defendant to show that making the facility readily accessible would result in a fundamental alteration of the nature of services or an undue burden. *See Pascuiti*, 87 F. Supp. 2d at 223. Although the Second Circuit has never explicitly addressed the use of such a framework in the context of an ADA claim under Title II, it has utilized this type of burden-shifting analysis in the context of a claim under Section 504 of the Rehabilitation Act. *See Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139-43 (2d Cir. 1993).[4] This Court concludes, as did the court in *Pascuiti*, that the Second Circuit's use of this framework in *Borkowski* would logically extend to an ADA claim under Title II. *See Pascuiti*, 87 F. Supp.2d at 223 (applying *Borkowski*). In any event, this burden-shifting framework is not critical in the instant case because the County does not take the position,

for purposes of the summary judgment motion, that plaintiff's proposed modifications would require a fundamental alteration of the Coliseum or would impose an undue financial hardship on the County.[5] Instead, the sole question here is whether plaintiff can meet his burden of proving that there are barriers at the Coliseum that render it not readily accessible. In the summary judgment context, the party opposing summary judgment must "'introduce enough evidence on an issue to have the issue decided by the fact-finder, rather than decided against the party in a peremptory ruling such as a summary judgment.'" *Gathright-Dietrich v. Atlanta Landmarks, Inc.*, 435 F. Supp. 2d 1217, 1225 (N.D. Ga. 2005) (quoting Black's Law Dictionary 190 (7th ed. 1999)). The County argues that Brown has failed to meet that standard on the issue of program accessibility. Brown counters that not only has he met that standard, but he is entitled to summary judgment in his favor because the County has not offered any evidence to counter his evidence that program accessibility under Title II is lacking at the Coliseum. The Court will now address the summary judgment motions in turn.

B. Application

1. County's Summary Judgment Motion

As noted above, the County does not

---

[4] Additionally, other courts have applied this framework in factually similar cases under Title III of the ADA. *See Colo. Cross Disability Coal. v. Hermanson Family Ltd.*, 264 F.3d 999, 1002-03 (10th Cir. 2001); *Access Now, Inc. v. South Fla. Stadium Corp.*, 161 F. Supp.2d 1357, 1363-65 (S.D. Fla. 2001); *Ass'n for Disabled Ams. v. Claypool Holdings LLC*, No. IPOO-0344, 2001 WL 1112109, at *26 (S.D. Ind. Aug. 6, 2001).

[5] At oral argument, counsel for the County confirmed that the County is not taking the position that these proposed modifications would result in an undue financial burden on the County. (FTR at 11:35-36; 11:38-40.) Instead, the County argues that plaintiff cannot prove the existence of any Title II violations at the Coliseum as a matter of law. Thus, the "undue financial hardship" question is not at issue for purposes of the summary judgment motions in this case.

argue, for purposes of its summary judgment motion, that the modifications that plaintiff seeks to the Coliseum would result in a fundamental alteration of the facility or that such modifications would be an undue financial burden. Instead, the County's fundamental argument is that, even if plaintiff is able to prove all of the alleged barriers to access identified in his complaint, he cannot as a matter of law demonstrate that such barriers constitute a Title II violation under the less stringent standard for a facility, such as the Coliseum, that existed when Title II became effective. As set forth below, the Court disagrees and concludes that plaintiff has set forth sufficient evidence to survive summary judgment on his claims under Title II and the Rehabilitation Act.

In opposing the County's motion for summary judgment, plaintiff has submitted several pieces of evidence to demonstrate that the Coliseum, when viewed in its entirety, is not readily accessible and usable by individuals with disabilities and, thus, does not meet the "program access" requirement of Title II. First, plaintiff has submitted a sworn affidavit in which he states, among other things, that: (1) he has difficulty purchasing wheelchair accessible seats because an insufficient number of these seats are available (according to plaintiff's expert, there are 44 wheelchair accessible seating locations in the 16,000 seat arena); (2) as a result, he is generally forced to purchase a standard seat and either attempt to get an accessible seat at the game or park his wheelchair in a seating aisle; and (3) he has difficulty with respect to numerous aspects of his visits to the Coliseum due to the lack of structural and other accommodations for his disability, including parking, physically accessing the building, using the restrooms and elevators, and purchasing food and souvenirs. Second,

plaintiff has submitted an expert report that concludes, following a site inspection at the Coliseum, that the Coliseum contains numerous barriers to access to the disabled in various areas of the property and building— including seating, parking, routes and ramps, restrooms, concessions and ticket counters, and elevators. The expert report also estimates that the total costs for modifications to rectify these barriers to access would be $190,650. Third, plaintiff submits private companies' responses to the County's 1994 request for proposals related to the identification and elimination of barriers to access at the Coliseum. One particular proposal—submitted by Greenman Pederson, Inc—concluded that a number of architectural/structural modifications needed to be made at the Coliseum to facilitate access to the arena by the disabled.

Having carefully reviewed plaintiff's evidence, the Court concludes that plaintiff has submitted sufficient evidence to raise genuine issues of fact on the issue of whether the Coliseum, as a whole, is readily accessible and usable by individuals with disabilities and on the issue of whether there are plausible modifications that can be made for which the costs do not clearly exceed the benefits. The County does not offer any expert or fact testimony to rebut plaintiff's evidence; rather, the County simply argues that, even under plaintiff's evidence, no Title II violations exist as a matter of law. The Court disagrees. If all of plaintiff's above-referenced evidence is credited and all reasonable inferences are drawn in his favor (as required under the summary judgment standard), a rational factfinder could certainly conclude that the Coliseum, as a whole, is not readily accessible to the disabled.

In reaching this decision, the Court has

considered the County's arguments as to why summary judgment is warranted despite plaintiff's evidence and finds the County's position to be unpersuasive. The County's core legal position (in its written submissions and again at oral argument) is that, because plaintiff has been able to attend games at the Coliseum over the past several years, he has demonstrated as a matter of law that the Coliseum is readily accessible to the disabled. (*See, e.g.,* Def.'s Mem. of Law at 9 ("The facility is accessible, and the complaint acknowledges that plaintiff obtained access."); *see also id.* ("[The plaintiff's expert report] does not address the inescapable fact that plaintiff attended hockey games at the Coliseum, and intends to do so in the future. This is program accessibility." (citations omitted)); Def's Reply Mem. of Law at 5 ("There is simply no question that by repeatedly attending the programs offered and by intending to do so again, irrespective of any alleged barrier, that the programs are accessible [to the plaintiff].").) In other words, the County's contention is that, if a disabled person is able to attend a game, the facility is "readily accessible" under Title II regardless of any difficulties that the disabled person had at the game regarding basic services (including obtaining seating and using the restrooms) and/or regardless of whether the disabled person was unable to obtain any seating for a number of other games. The Court disagrees with the County's legal premise. Although physical presence by the disabled at a facility constitutes some evidence of accessibility, it does not necessarily equate with the facility being *readily* accessible and usable by the disabled under the law. Here, plaintiff claims, among other things, that, although he has attended some games, he (1) has been unable to obtain wheelchair accessible seats due to a lack of availability and has had to (at least on

some occasions) park his wheelchair in a seating aisle, and (2) in games he has attended, (a) he had trouble locating available handicap accessible parking, (b) had trouble getting into the Coliseum because of a lack of proper ramps, broken up pavement, high lips at curb cuts, and high thresholds on the entrance doors, and (c) had great difficulty using the restrooms because of various physical barriers in the bathroom and, thus, avoids food or drinks at the game so he does not have to use the restrooms. If plaintiff can prove that these barriers exist to attending the game and/or thwart his ability to use basic services while at the game, he can prove that the Coliseum is not readily accessible and/or usable as a whole under Title II even if he has managed to attend certain games with great difficulty and plans on doing so in the future. Thus, the Court rejects the County's argument that plaintiff's attendance at some games requires summary judgment as a matter of law in its favor.

This Court's decision on this issue is consistent with numerous courts in other jurisdictions. For example, in *Shotz v. Cates*, 256 F.3d 1077 (11th Cir. 2001), the county argued that plaintiffs could not prove that the courthouse was not readily accessible to individuals with disabilities, when viewed in its entirety, because the plaintiffs were able to attend trials in the courthouse. The Eleventh Circuit rejected that argument. In concluding that plaintiffs' Title II claim survived a motion dismiss, it explained:

> The County contends that because both [plaintiffs] were able to attend the trial, they have not alleged a violation of Title II. A violation of Title II, however, does not occur only when a disabled person is completely prevented from enjoying a service,

program, or activity. The regulations specifically require that services, programs, and activities be "readily accessible." 28 C.F.R. § 35.150. If the Courthouse's wheelchair ramps are so steep that they impede a disabled person or if its bathrooms are unfit for the use of a disabled person, then it cannot be said that the trial is "readily accessible," regardless whether the disabled person manages in some fashion to attend the trial. We therefore conclude that the plaintiffs have alleged a set of facts that, if true, would constitute a violation of Title II.

256 F.3d at 1080; *accord Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 861 (10th Cir. 2003) ("We therefore do not agree with Defendants that mere physical presence on the fairgrounds—at least when coupled with being effectively trapped in a handicapped section, unable to leave for food or to use the restroom, unable to view the stage, and subjected to being climbed over, stepped on, and bumped into by other attendees—amounts to anything other than a denial of the benefits of the fair."); *Hanebrink v. Adams*, C.A. No. 8:08-74-HMH, 2009 WL 3571539, at *3 (D.S.C. Oct. 26, 2009) (citing *Shotz*); *see also Marshall v. Green County*, No. 1:05CV-130, 2006 WL 335829, at *3 (W.D. Ky. Feb. 13, 2006) (rejecting argument that, because plaintiff was able to reach courtroom, the courtroom is readily accessible as a matter of law); *Ewbank v. Gallatin County*, No. Civ. A. 03-156-DLB, 2006 WL 197076, at *1 n.2 (E.D. Ky. Jan. 17, 2006) ("The fact that [plaintiff] was eventually able to attend the meeting and hearings [at the county courthouse] is not dispositive."); *Ass'n for Disabled Ams., Inc. v. Concorde Gaming Corp.*, 158 F. Supp. 2d 1353, 1367 (S.D. Fla. 2001) ("If a public accommodation's restrooms are 'unfit for the use of a disabled person,' the public accommodation is not accessible.").

The County's argument with respect to individual access issues at the Coliseum is similarly flawed. Specifically, the County attempts to divide up plaintiff's claim and argue that each alleged barrier to access, by itself, does not render the facility inaccessible. (*See* Def.'s Mem. of Law at 9 ("The number and condition of the parking spaces do not alter the conclusion that the Coliseum is readily accessible."); *id.* ("The fact that the report claims that there is inadequate handicap seating of [sic] that some of the bathrooms do not meet the standards for new buildings or that the counters at concessions are too high, does not render the program inaccessible . . . ."). As noted earlier, the Court recognizes that, with respect to existing facilities, the law does not require that every portion of the facility be readily accessible in order to comply with the ADA, but rather the question is overall accessibility. However, it is equally clear that individual barriers to access, while not themselves violations under this standard, can cumulatively result in a facility being not readily accessible. Here, drawing all inferences in plaintiff's favor, plaintiff has submitted sufficient evidence to preclude summary judgment on the issue of whether all of the alleged individual barriers to access identified in his affidavit and plaintiff's expert report collectively demonstrate that the Coliseum is not readily accessible or usable by the disabled as a whole. *See, e.g., Chaffin*, 348 F.3d at 861 ("In this case, the 'individual elements' that are not handicap accessible add up to a wholesale exclusion of disabled individuals from buildings, restrooms, dining areas, and seating areas across the entire fairgrounds. We therefore agree with the district court that the Kansas State Fair, when

viewed in its entirety and based on uncontroverted facts, is not readily accessible to and usable by individuals with disabilities."); *Pascuiti*, 87 F. Supp. 2d at 224 ("While proving that particular barriers exist might not be sufficient to establish Title II liability, each barrier is a building block for a finding that the Stadium, viewed in its entirety, is not readily accessible. Thus, plaintiffs may demonstrate accessibility barriers in discrete locations as part of their effort to sustain their burden of proof.").

The County next suggests that the report by plaintiff's ADA expert, setting forth well over 100 alleged violations of the ADA at the Coliseum, does not provide probative evidence of plaintiff's Title II claims because it relies on the ADAAG standards, which are not applicable to existing structures such as the Coliseum. (*See* Def.'s Mem. of Law at 8 ("Plaintiff's reliance on the standards in the ADAAG is misplaced . . . . [B]y the regulations' own provisions, they do not apply to an existing structure, like the Coliseum.").) As a threshold matter, the Court agrees with the County that the more stringent ADAAG regulations are not applicable to the Coliseum, which was an existing facility at the time of the effective date of the ADA; rather, the standard is the less stringent requirement of "program accessibility"as a whole. Thus, if plaintiff were able to prove that the Coliseum facility violates the ADAAG regulations in one way, or multiple ways, it would not necessarily mean that the County has violated the ADA or the Rehabilitation Act. In other words, a plaintiff certainly cannot claim that an existing facility's non-compliance with the ADAAG standards, by itself, constitutes a prima facie violation of the ADA. However, while the ADAAG regulations clearly are not dispositive in this case, they can still provide guidance as to whether an existing facility is readily accessible and usable by individuals with disabilities. *See, e.g.*, *Flynn v. Doyle*, 672 F. Supp. 2d 858, 879 (E.D. Wis. 2009) ("[E]vidence regarding the alleged failure to meet the UFAS/ADAAG standards could still be relevant in the context of a 'program accessibility' case"); *Pascuiti*, 87 F. Supp. 2d at 226 ("[E]ven though only new construction and alterations must comply with the Standards, those Standards nevertheless provide valuable guidance for determining whether an existing facility contains architectural barriers," and "plaintiffs are allowed to compare facilities at the Stadium with the requirements laid out in the Standards as part of their effort to establish individual barriers to access"); *see also Hanebrink v. Adams*, C.A. No.8:08-74-HMH, 2009 WL 3571539, at *4 (D.S.C. Oct. 26, 2009) ("[A]lthough the ADAAG provides valuable guidance regarding compliance with the ADA, it does not control in this case. Instead, the Defendant must meet 'the lesser standard for existing facilities under Title II' that the facilities are 'readily accessible.'") (citing *Pascuiti*, 87 F. Supp. 2d at 226); *Gathright*, 435 F. Supp. 2d at 1226 ("Based on the language of the ADA, the purpose of the Standards and the cases which discuss barriers in existing facilities, the Court concludes a 'barrier' under the ADA [for an existing facility] should be determined using the Standards as a guide. However, it is clear the Standards are not intended to prescribe what must be done to address an alleged barrier in a facility that existed at the time the ADA was passed. They are to be used as a guide, not a requirement."); *Access Now, Inc. v. S. Fla. Stadium Corp.*, 161 F. Supp. 2d 1357, 1368 (S.D. Fla. 2001) ("The [ADA] does not require ADAAG compliance of existing facilities; accordingly, the Court cannot determine the Defendants' liability from finding that elements of the Stadium deviate

from those Standards. The Standards nevertheless provide 'valuable guidance' for determining whether an existing facility contains architectural barriers." (quoting *Pascuiti*, 87 F. Supp. 2d at 226 (internal citation omitted))). Thus, the Court cannot and will not use the ADAAG standards as a requirement for the Coliseum, but rather may use those standards as a guide to determine, in conjunction with the other evidence, whether there are barriers at the Coliseum that violate the less-stringent "program access" standard for existing structures.

For example, in this case, with respect to the issue of seating, plaintiff has put forth evidence that the Coliseum has 44 wheelchair seating locations in the 16,000-seat arena and that plaintiff has great difficulty getting one of those locations for certain games. (*See* Pl.'s Aff. ¶ 10*;* Pl.'s Ex. B-2 at 6.) In arguing that the 44 designated seats for the disabled are insufficient and render the Coliseum not readily accessible to the disabled, plaintiff notes that, under the ADAAG, a new arena that is the same size as the Coliseum would be required to have 161 wheelchair accessible seating locations in order to be in compliance with Title II. Thus, although the Coliseum (as an existing structure) is not required to have 161 wheelchair accessible seats to comply with Title II, it may be relevant and provide some guidance (in conjunction with other evidence) in determining whether 44 such seats would be sufficient in a 16,000-seat existing structure in providing an arena that is readily accessible to the disabled. To the extent that the County also suggests that the ADAAG is the only thing that plaintiff relies upon to establish a violation, that contention is contradicted by the record in this case. In particular, plaintiff also relies on, among other things, his sworn statement that he has been unable to obtain these wheelchair-accessible seats for various games due to their unavailability. Plaintiff has also submitted the 1994 proposal solicited by the County that recommended that the Coliseum have at least 170 wheelchair-accessible seating locations disbursed evenly throughout the facility. (*See* Pl.'s Ex. E at 27.) The County has proffered no evidence that these wheelchair accessible seats have been underutilized, and available, for each of the Islander games at the Coliseum (or some percentage thereof).[6] Thus, the Court rejects the County's argument that plaintiff is improperly and/or exclusively relying upon the ADAAG standards to prove a *prima facie* case; rather, the standards may be properly considered as non-dispositive guidance in determining whether the plaintiff's evidence, as a whole, demonstrates that an existing facility is readily accessible and usable by individuals with disabilities.

Next, the County argues that plaintiff cannot prevail on the ADA or Rehabilitation Act claims because plaintiff has not alleged that he requested a specific accommodation for his disability. (Def.'s Mem. of Law at 10-13.) Thus, according to the County, summary judgment is warranted given the absence of any such request. The Court disagrees. The

---

[6] The County does argue that plaintiff has failed to articulate specifically how the constructing additional wheelchair-accessible seating for the disabled is "readily achievable" given the structure of the existing facility. However, plaintiff's expert report, as well as the recommendations in the 1994 proposal solicited by the County itself, are sufficient to raise a genuine issue of disputed fact on the issue of whether plaintiff can meet his burden of proving that modifications to allow additional wheelchair-accessible seating and the other proposed structural modifications sought by plaintiff are readily achievable.

Court recognizes that the "reasonable accommodation" requirement by a public entity is not triggered unless the public entity has knowledge that an individual requires an accommodation of some kind to receive the benefits of its services and that such knowledge is generally triggered by a request. *See, e.g.*, *Robertson v. Las Animas County Sheriff's Dep't*, 500 F.3d 1185, 1196 (10th Cir. 2007). Plaintiff notes that several courts have concluded that, where the claim is an overall lack of program accessibility under Title II and its implementing regulations (rather than a denial of a particular reasonable accommodation), there is no requirement that the plaintiff have requested a specific accommodation before filing the lawsuit in order to prevail. *See, e.g.*, *Bacon v. City of Richmond*, 386 F. Supp. 2d 700, 707 (E.D. Va. 2005) ("The law does not require, as City Defendants suggest, that Plaintiffs' request some specific form of accommodation as a prerequisite to a valid ADA claim. This argument is frankly ludicrous. The ADA requires that any program or activity held at a school be made accessible to the handicap. The burden is not on the disabled to create accommodation solutions, but on those that provide services or facilities which hinder their participation."). However, the Court need not determine whether the request requirement would apply to the claims here because, even assuming *arguendo* it does, plaintiff has submitted evidence that would allow this requirement to be satisfied in an alternative manner, and, thus, such evidence defeats any motion for summary judgment on this ground. Specifically, it is well settled that a request for an accommodation is not required where the disabled individual's need for an accommodation is obvious. *See Robertson*, 500 F.3d at 1197 ("When a disabled individual's need for an accommodation is obvious, the individual's

failure to expressly 'request' one is not fatal to the ADA claim."); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) ("When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required . . . ."); *see also McCoy v. Tex. Dep't of Crim. Just.*, C.A. No. C-05-370, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006) ("A disabled person's failure to expressly 'request' an accommodation, however, is not fatal to an ADA claim where the defendant otherwise had knowledge of an individual's disability and needs, but took no action." (collecting cases)). As the Tenth Circuit has noted, "[w]hether the public entity's knowledge derives from an individual's request for an accommodation or an individual's obvious need for an accommodation, the critical component of the entity's knowledge is that it is aware not just that the individual is disabled, but that the individual's disability affects his ability to receive the benefits of the entity's services." *Robertson*, 500 F.3d at 1197 n.10. Here, plaintiff has submitted evidence—including the 1994 report solicited by the County, as well as other evidence regarding barriers to access to basic services, such as seating and restrooms—that precludes summary judgment on the issue of whether the need for accommodations for disabled individuals in wheelchairs at the Coliseum was obvious to the County even in the absence of a request for any particular accommodation.

Finally, the County argues that it is not responsible for non-structural access problems, such as problems with vendor carts and ticket concession counters; rather, pursuant to the lease agreement, vendors are hired and controlled by former defendant SMG and their actions are not the legal

responsibility of the County. (Def.'s Mem. of Law at 13-14.) However, the applicable regulations do not allow the owner of a facility to immunize itself, through contract or otherwise, from compliance with the ADA. *See* 28 C.F.R. § 35.130(b)(1)(i) (explaining that "[a] public entity, in providing any . . . service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability . . . [d]eny a qualified individual with a disability the opportunity to participate or benefit from the aid, benefit, or service"). Thus, the County also can be liable for any non-structural items that, when taken in their entirety, are shown to deprive the disabled of program access to the arena. In any event, plaintiff has put forth other evidence regarding structural barriers that is sufficient (completely apart from any non-structural barriers) to preclude summary on the Title II and Rehabilitation Act claims. Therefore, summary judgment on this ground also is denied.

In short, if plaintiff's evidence is credited and all reasonable inferences are drawn in his favor, a rational factfinder could conclude that plaintiff has met his burden of proving that (1) the Coliseum, when viewed in its entirety, is not readily accessible and usable by individuals with disabilities—that is, it lacks program accessibility, and (2) there are plausible modifications that could be made to make the facility readily accessible and the costs of such modifications, facially, do not clearly exceed their benefits. Accordingly, defendant's motion for summary judgment is denied.

## 2. Plaintiff's Summary Judgment Motion

Plaintiff has cross-moved for summary judgment. In particular, pointing to the same evidence upon which he relied in opposing the County's summary judgment motion (namely, his affidavit, his expert reports, and the 1994 report submitted to the County), plaintiff argues that he is entitled to summary judgment on his claims because the County has failed to submit its own expert reports (or other evidence) to rebut plaintiff's evidence. (*See* Pl.'s Mot. for Summ. J. at 13 ("Plaintiff's expert reports coupled with Defendant's lack of any rebuttal reports or any evidence [sic] demonstrate that the Program at Nassau Coliseum is inaccessible and Plaintiff's Motion for Summary Judgment should be granted.").) The Court disagrees. As set forth below, even in the absence of its own expert reports, the County is clearly challenging the methodology and conclusions of plaintiff's ADA expert regarding whether or not barriers to access by the disabled exist and whether any such barriers deprive disabled individuals in wheelchairs of program accessibility. Under the circumstances of this case, the County is entitled to have this fact-specific inquiry determined at trial after the factfinder has had the opportunity to evaluate the testimony and credibility of plaintiff's ADA expert in the context of all of the other evidence, including the testimony and credibility of plaintiff. Accordingly, summary judgment in plaintiff's favor is unwarranted.

Courts have recognized that "the grant of a motion for summary judgment is often inappropriate where the evidence bearing on crucial issues of fact is in the form of expert opinion testimony." *Webster v. Offshore Food Serv., Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970). In fact, even if a plaintiff offers expert testimony on a claim and the defendant does not have its own expert, the defendant is still generally entitled to overcome a summary judgment motion by a plaintiff and require plaintiff to have the factfinder evaluate the expert testimony to determine whether the

plaintiff has met his or her burden. The rationale behind this rule is based upon two principles of law: (1) the trier of fact is entitled to evaluate the credibility of witnesses, including experts, and weigh their testimony; and (2) the trier of fact may reject expert testimony, even if uncontradicted, and may substitute its own common-sense judgment for that of the expert in light of all the evidence in the case. *See Webster*, 434 F.2d at 1193 (discussing rationale for the rule); *see also Powers v. Bayliner Marine Corp.*, 83 F.3d 789, 797 (6th Cir. 1996) ("There are many circumstances in which testimony need not be accepted even though formally uncontradicted." (quotations and citations omitted)); *Hassan v. Stafford*, 472 F.2d 88, 96 (3d Cir. 1973) ("[A] trier of fact is not bound to accept an expert's opinion merely because it is uncontradicted."); *Drysdale v. Woerth*, 153 F. Supp. 2d 678, 689 (E.D. Pa. 2001) ("Questions about credibility and weight of expert opinion testimony are also for the trier of facts since such testimony is ordinarily not conclusive. The fact finder is free to accept or reject expert testimony as it deems proper, even if such testimony is uncontroverted." (citations omitted)). In other words, "once 'the court admits (expert) testimony, then it is for the jury to decide whether any, and if any what, weight is to be given to the testimony.'" *Webster*, 434 F.2d at 1193 (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627 (1944) (alteration in original)). Thus, where a party is relying upon expert testimony as being dispositive on a particular claim or issue, it generally will be unable to obtain summary judgment even in the absence of an opposing expert.

However, courts have found a narrow exception to this rule. Specifically, courts have concluded that "when a party opposing summary judgment fails to present evidence sufficient to make an issue of an expert's conclusion—such as contrary opinion evidence or evidence tending to undermine the expert's credibility or qualifications—and when 'the trier of fact would not be at liberty to disregard arbitrarily the unequivocal, uncontradicted, and unimpeached testimony of an expert testimony,' expert testimony may form the basis of summary judgment." *Watson v. Allstate Tex. Lloyd's*, 224 F. App'x 335, 342 (5th Cir. 2007) (quoting *Webster*, 434 F.2d at 1193-94); *accord Wingster v. Head*, 318 F. App'x 809, 815 n.10 (11th Cir. 2009); *Dean v. Chrysler Corp.*, No. 93-3404, 1994 WL 574188, at *5 (5th Cir. 1994) (unpublished opinion); *see also Castleberry v. Collierville Med. Assocs. Inc.*, 92 F.R.D. 492, 494 (W.D. Tenn. 1981) (granting summary judgment in favor of defendant in absence of a response by plaintiff to defendant physicians' motion in medical malpractice action, which included affidavits of four doctors).[7] Such a situation might occur where the unimpeached testimony at issue "bears on technical questions of medical causation beyond the competence of lay determination." *Webster*, 434 F.2d at 1193. It is important to emphasize, even in such situations involving technical issues beyond a lay person's understanding, summary judgment would be warranted under this narrow exception only where the opposing party had provided no

---

[7] *See generally* Charles Alan Wright, et al., 10B Fed. Prac. & Proc. Civ. (3d ed.) § 2738 ("[B]ecause opinion testimony always is subject to evaluation by the fact finder, it generally has been held not an appropriate basis for summary judgment. In contrast, if the only issue is one of the kind on which expert testimony must be presented, and nothing is presented to challenge the affidavit of the expert, summary judgment may be proper." (footnote ommitted)).

basis whatsoever for the lay factfinder to otherwise reject the qualifications, methodology, or credibility of the expert. *See id*. at 1194 ("We are not confronted with expert testimony which is equivocal or internally inconsistent, or which bears on issues as to which, by their nature, the trier of fact would be entitled to substitute its own practical judgment for the opinion of experts, even though the expert testimony be uncontradicted. We hold only that, in the absence of opposing evidence, the unequivocal testimony offered in support of the motion in this case supported the District Court's conclusion that there was no genuine issue of material fact to be resolved." (footnote omitted)).

In the instant case, even though the County has submitted no expert to contradict plaintiff's ADA expert, a factfinder could still reject plaintiff's expert testimony and find in favor of the County depending upon how the factfinder evaluated and weighed the expert's testimony in light of all the evidence in the case. First, this is not a situation where the County has failed to provide any basis for challenging the conclusions of the plaintiff's expert; rather, the County's position is that the expert's methodology and conclusions are flawed on a number of levels. For example, the County argues that the expert relies too heavily on the ADAAG standards, instead of focusing on program accessibility as a whole. Similarly, the County argues that the report fails to "address the inescapable fact that plaintiff attended hockey games at the Coliseum" and fails to specifically describe how the arena falls short of the applicable "program accessibility" standard. (Def.'s Mem. of Law at 9.) The County is entitled to attempt to impeach plaintiff's expert on these and other issues and invite the factfinder to reject such testimony based upon one or more

of these purported flaws. Second, the issues being explored in this lawsuit—namely, program accessibility at a sports arena—are not so technical as to be "beyond the competence of lay determination." *Webster*, 434 F.2d at 1193. In other words, although expert testimony on these issues may assist a trier of fact, a factfinder can certainly utilize his or her own common sense, experience, and judgment to reject such testimony in light of all the evidence (including plaintiff's testimony, which will be subject to cross-examination). For example, if an expert concludes that structural barriers in restrooms prevent use by disabled individuals in wheelchairs at the Coliseum, a factfinder could look at photographs of the restrooms and conclude (if the physical evidence supported it) that an individual in a wheelchair would be able to utilize them. In short, given the nature of the issues in this case, a factfinder may reject expert testimony, even if uncontradicted, and may substitute its own common-sense judgment for that of the expert in light of all the evidence in the case. Finally, the analysis of these issues regarding whether or not one or more barriers render a facility inaccessible as a whole under the applicable standard is a fact-specific inquiry that generally does not lend itself to summary judgment. *See, e.g.*, *Access Now, Inc.*, 161 F. Supp. 2d at 1371 (explaining that whether modifications under ADA are "'readily achievable' is a fact-intensive inquiry that will infrequently be decided on summary judgment"). This is particularly true under the circumstances of this case where the factfinder must examine whether one or more specific barriers, if proven, are sufficiently severe to deprive the plaintiff of program accessibility. Accordingly, the County is entitled to have these issues submitted to a factfinder at trial, and summary judgment in plaintiff's favor is

unwarranted.[8]

\*\*\*

In sum, after carefully reviewing the evidence, the Court concludes that the legal issues regarding plaintiff's ADA and Rehabilitation Act claims cannot be determined on summary judgment in this particular case, but rather need to be resolved at trial. Therefore, the cross-motions for summary judgment are denied. The parties shall participate in a telephone conference on Thursday, September 16, 2010 at 9:30 a.m. to set a schedule for submission of a joint pre-trial order. At that time, counsel for defendant shall initiate the call and, once all parties are on the line, contact Chambers at (631) 712 5670.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 3, 2010
Central Islip, New York

\* \* \*

Plaintiff is represented by James Griffin, Brian Ku, and Louis Mussman, Ku & Mussman, P.A., 11098 Biscayne Blvd., Suite 301, Miami, FL 33161. Defendant is represented by Andrew Reginald Scott, Office of the Nassau County Attorney, 1 West St., Mineola, NY 11501.

---

[8] At oral argument, plaintiff's counsel attempted to rely upon *Ewbank v. Gallatin County*, No. Civ. A. 03-156-DLB, 2006 WL 197076 (E.D. Ky. Jan. 17, 2006) and *Chaffin v. Kansas State Fair Board*, 348 F.3d 850 (10th Cir. 2003) as examples of cases where courts granted plaintiffs summary judgment under Title II of the ADA. (*See* FTR at 11:55-57.) These cases, however, are distinguishable. First, nothing in either case indicates that defendant, as is the situation here, was disputing or challenging the conclusions of an expert report submitted by the plaintiff. Additionally, in *Chaffin*, it was undisputed that, among other things, there was inadequate seating in the state fair grandstand and many restrooms were inaccessible. Here, by contrast, the County vigorously disputes whether there is adequate disabled seating and points to evidence, namely the existence of 44 wheelchair accessible seating areas, in support of its argument. In sum, neither *Ewbank* nor *Chaffin* is analogous to the situation here.